***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for modification of the amount of the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and the subject matter.
2. This is an action filed pursuant to the North Carolina Tort Claims Act, N.C. Gen. Stat. § 143-291, et seq.
3. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
4. At all times relevant to this case, plaintiff was incarcerated in the North Carolina Department of Correction, Raleigh, Wake County, North Carolina at Central Prison, except when he was operated on by Dr. Walter Loehr in June 1996 and again in August 1996 at Durham Regional Hospital; and when he was seen by Dr. Daniels, partner of Dr. Loehr on 30 June 1996 at Durham Regional Hospital.
5. Defendant is an agency of the State of North Carolina.
6. At the time of hearing before the Deputy Commissioner, plaintiff was a citizen and resident of West End, North Carolina.
7. The alleged named negligent employer, Dr. Walter Loehr, is an authorized agent of defendant and any negligence on the part of Dr. Loehr is imputed to defendant.
8. Plaintiff's medicals from defendant are admitted into evidence.
9. The issues to be determined by the Commission are whether defendant was negligent pursuant to the Tort Claims Act; and, if so, what, if any, damages is plaintiff entitled to recover.
 *********** RULINGS ON EVIDENTIARY MATTERS
Defendant's objection with respect to the admission into evidence of the discovery deposition of Dr. Walter Loehr is Sustained.
Defendant's objection with respect to the testimony of Dr. Luke Erdoes is Overruled.
Defendant's objection with respect to the testimony of Dr. Mark Borowicz is Overruled.
Plaintiff's objection with respect to defendant's inclusion in the contentions of plaintiff's conviction and sentence is Sustained and the Motion to Strike is Allowed.
The objections contained within the depositions of Dr. Walter Loehr, Dr. Mark Borowicz and Dr. Luke Erdoes are ruled upon in accordance with the applicable rule of law and the Decision and Order in this case.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modifications and finds as follows:
 FINDINGS OF FACT
1. In 1996 plaintiff was a 58 year old male inmate in the North Carolina Department of Correction. At that time plaintiff suffered from arteriosclerosis and diabetes, but did not require insulin maintenance. Arteriosclerosis is a disease of the peripheral blood vessels characterized by narrowing and hardening of the arteries that supply the legs and feet, resulting in decreased blood flow. This condition can result in cramping pain in the legs, or claudication.
2. In April 1996 plaintiff underwent an arteriogram at Durham Regional Hospital. The test indicated that plaintiff had a blockage in the femoral artery of his left leg. This artery runs from the knee to the top of the thigh. At this time plaintiff experienced a great deal of leg pain, even when seated.
3. On 16 June 1996 Dr. Walter Loehr performed a femoral-politeal ("fem-pop") surgical procedure on plaintiff. Dr. Loehr is a certified general surgeon in practice with Dr. James Davis in Durham, North Carolina and was an agent of the Department of Correction in June 1996. Dr. Loehr performed vascular surgeries, but was not certified as a vascular surgeon.
4. The surgery consisted of an initial incision in the knee area (popliteal area) of plaintiff's left leg. Dr. Loehr found a palpable pulse in the vessel at the time of surgery but did not detect a pulse by dopplar study prior to surgery. A plastic graft was attached to the femoral vessel. There was minimum blood flow above the graft and Dr. Loehr performed a thrombectomy, sending a wire up the iliac artery to clean out any clot that was present.
5. Dr. Loehr cleaned out a significant organized clot, or clot material which had been present for some time. This procedure increased the blood flow somewhat but poor blood flow was still noted through the graft. Following surgery, plaintiff was transferred to intensive care.
6. On 17 June 1996 a dopplar study revealed the left iliac-femoral artery vessel was occluded and the fem-pop graft was blocked. The popliteal artery feeding the lower leg was open and probably being fed through collateral vessels.
7. Plaintiff was discharged back to Central Prison Hospital on 18 June 1996. Dr. Litsey was one of the physicians at Central Prison. Plaintiff received coumadin, which is a blood thinner, to help improve the blood flow to his left leg. Plaintiff received diabeta for his diabetes, percocet for his pain and a nicotine patch for his habitual smoking. On discharge plaintiff was advised to quit smoking. Dr. Loehr ordered plaintiff's dressings over his wound to be changed daily.
8. Dr. Loehr continued to care for plaintiff and saw him on June 20, June 30 and July 11, 1996. Dr. Loehrs' partner also checked plaintiff on July 9, 16 and 29, 1996. While at Central Prison Hospital, plaintiff's surgical dressing was changed forty-eight (48) times in the fifty-five days up until 12 August 1996. Medical records note routine checks of plaintiff's blood sugar from the time of his graft surgery until his release from prison. Dr. Loehr ordered that plaintiff was to remain on the same medications.
9. A 30 June 1996 nurse's note from Central Prison Hospital mentioned the need to discuss with Dr. Loehr in the next one to two weeks the possibility of amputation. On that date plaintiff's left leg was cold to the touch but a pedal pulse was present. Plaintiff was also experiencing a great deal of pain on 30 June 1996 and subsequent to this date.
10. An infection become apparent in the wound site and the dressing was changed, using a wet to dry procedure. By 14 July 1996 the infection was still present. The left foot appeared mottled and cool to touch. A pedal pulse was present, but weak. On 16 July 1996 the wound on plaintiff's thigh was still draining and tender, but there was no odor and the capillary refill around the wound had improved.
11. On 17 July 1996 the thigh wound looked bad and needed debriding. Plaintiff's left foot was cold and blue and plaintiff was in tears. A call was made to the physician to increase the pain medication. When plaintiff's dressing was changed on 18 July 1996 he experienced severe pain. The area surrounding the left thigh wound was dark and had an odor. By 24 July 1996 the thigh wound area was pink with yellow edges. On 25 July 1996 plaintiff's lower left leg appeared dark red. The outer aspect of the knee was warm but the lower part of the leg was cool.
12. Plaintiff's thigh wound appeared smaller on 26 July 1996 but there was some necrotic tissue in the deeper areas. On 27 July 1996 there was a small black area noted on plaintiff's left foot. His leg was cool with purple mottling. The left thigh incision was very tender with the purulent yellow drainage; the area surrounding the incision was purple and black. Within the next day plaintiff began running a low-grade fever. During this time plaintiff slept a great deal with the pain medication. On 1 August 1996 plaintiff's left leg was bluish-red from the knee down.
13. On 4 August 1996 plaintiff complained of left foot pain greater than in the past. His left leg was purplish in color and cool to the touch. On 8 August 1996 Dr. Loehr requested authorization to ampute plaintiff's left leg.
14. On 12 August 1996 Dr. Loehr amputated plaintiff's left leg above the knee. A pathological report dated 13 August 1996 revealed calcified plaque of the arterial vessels. The diagnosis of plaintiff's amputated leg was atherosclerosis and gangrene.
15. On 27 August 1996 plaintiff was transferred to McCain Correctional Hospital. A prosthesis was provided to plaintiff on 26 January 1997 for his left leg. Plaintiff was released from the state correctional system on 18 July 1997.
16. Following plaintiff's release from prison he sought treatment from Dr. Luke Erdoes. Dr. Erdoes at that time was a vascular surgeon with Pinehurst Surgical Clinic located in Pinehurst, North Carolina. Dr. Erdoes is board certified in vascular surgery, which is surgery of the blood vessels.
17. Dr. Erdoes performed a bypass operation on plaintiff's right leg consisting of a ilifemoral endarterectomy and a femoral to below-the-knee popliteal artery bypass using one of plaintiff's veins. Plaintiff was experiencing claudication of the right leg similar to what he experienced with the left leg in 1996. Dr. Erdoes performed the surgery in 1998 and the surgery was successful.
18. Dr. Erdoes is familiar with the standard of care for vascular surgeons, as it existed in communities such as Durham and Raleigh, North Carolina, in 1996. The greater weight of the medical evidence is that plaintiff's care in 1996 by Dr. Loehr was not consistent with the recognized standards of practice by vascular surgeons or general surgeons performing vascular surgery.
19. In a vascular operation for claudication where an arteriogram indicates iliac and femoral disease, a surgeon must have sufficient inflow to work, particularly with a plastic bypass. Dr. Loehr did not have sufficient inflow for the procedure he performed. The standard of care with that type patient in the Durham and or Raleigh area in 1996 required a different procedure such as an iliofemoral endarterectomy or bypass. Dr. Loehr should have repeated the arteriogram just prior to the surgery to establish whether sufficient inflow existed. He also should have contacted a vascular surgeon during the surgical procedure when he realized that the procedure did not work and that there was insufficient flow into the leg. Instead, Dr. Loehr closed up the incision and weeks later had to reopen the wound site and amputate the leg. Additionally, Dr. Loehr did not properly monitor and respond accordingly when plaintiff exhibited problems after the surgical procedure. One instance of this inappropriate follow-up involved coumadin, or blood thinner, which is necessary after a fem-pop to prevent clotting. Coumadin levels must be carefully monitored in order to insure the adequate therapeutic benefit. Coumadin levels must be checked in the blood and the INR (International Normalized Ratio) needs to be more than 2.0 to be effective. The 8 July 1996 lab test revealed plaintiff had an INR of 1.7. On 26 July 1996, the only other time plaintiff was tested for coumadin, the INR was 1.8. Insufficient coumadin levels could have precipitated the vascular thrombosis, which led to the gangrene and resulting loss of plaintiff's left leg.
20. Dr. Mark Borowicz is a board-certified vascular/general surgeon who practices in Myrtle Beach, South Carolina. Dr. Borowicz is familiar with the standard of care for general surgeons and vascular surgeons in communities such as Durham, North Carolina or a similar type community in 1996. Although Dr. Borowicz is married to plaintiff's counsel's niece, his testimony and expert opinions are found to be credible. His opinions are consistent with Dr. Erdoes' opinions, and both physicians maintain that Dr. Loehr's care of plaintiff was a violation of acceptable standards of practice for Durham or a similar community.
21. From 12 June 1996 through the date of the amputation of his left leg plaintiff was in severe pain. At the time of amputation the greater weight of the evidence is that plaintiff was suffering from wet gangrene. Wet gangrene is life threatening and requires immediate action. Dr. Loehr failed to diagnose and treat plaintiff for wet gangrene.
22. Prior to his incarceration, plaintiff performed various manual labor jobs. Plaintiff has been unable to work since his release from prison. The greater weight of the evidence is that the loss of plaintiff's left leg was not a factor in his being unable to work, which was due in large part to his preexisting condition of severe arteriosclerosis. Plaintiff has a wheelchair and a prosthesis for mobility.
23. Dr. Litsey was one of the physicians plaintiff received treatment from at North Carolina Central Hospital following his surgery by Dr. Loehr in June 1996. The greater weight of the evidence is that plaintiff's surgery follow-up at North Carolina Central Hospital fell below the standard of care for the Raleigh community or similar communities. However, Dr. Loehr was the surgeon and was ultimately responsible for supervision of plaintiff's post-surgery follow-up care. There is insufficient evidence that Dr. Litsey was negligent or that he was responsible for supervision of any employee who may have been negligent in plaintiff's care and treatment.
24. Although defendant was allowed additional time after the Deputy Commissioner hearing to locate and depose an expert to testify on behalf of Dr. Loehr concerning his treatment of plaintiff, defendant did not offer any expert medical testimony.
25. The reasonable value of damages which plaintiff sustained as a result of Dr. Walter Loehr's negligence is $200,000.00.
 ***********
Based upon the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. In order to prevail under the N.C. Tort Claims Act, a plaintiff must prove negligence on the part of a named state employee or agent while acting within the scope of his employment or agency. N.C. Gen. Stat. § 143-291. Dr. Walter Loehr, the agent of defendant, breached the standard of care among members of the same health profession, with similar training and experience situated in the same or similar communities, in his treatment of plaintiff in 1996. Alt v. John UmsteadHospital, 125 N.C. App. 193, 479 S.E.2d 800 (1997); N.C. Gen. Stat. § 90-21.12.
2. Dr. Loehr was negligent in his treatment of plaintiff and this negligence is imputed to defendant.
3. As the result of Dr. Loehr's negligence as the named agent of defendant, plaintiff sustained physical, mental and emotional damages, entitling him to be paid $200,000.00 as compensation for said damages. N.C. Gen. Stat. § 143-291, et. seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant shall pay to plaintiff the sum of $200,000.00.
2. Defendant shall also pay the costs due this Commission.
This the ___ day of July 2002.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN
TBS: ijd